IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| LAYNE MORRIS, an individual; TABITHA SPEER, in her own right; TABITHA SPEER, as Executrix of the ESTATE OF CHRISTOPHER SPEER; and TABITHA SPEER on behalf of her minor children T.S. and T.S., | |
| Plaintiffs, | MEMORANDUM OPINION AND ORDER GRANTING MOTION FOR DEFAULT JUDGMENT |
| vs. | |
| AHMAD SA'ID KHADR, an individual, a.k.a. AHMAD SAID KHADR, a.k.a. AHMED SAID KHADR, a.k.a. AL-KANADI, a.k.a. ABU ABD AL-RAHMAN, | Case No. 2:04-CV-00723 PGC |
| Defendant. | |

This may be the first Anti-Terrorism Act suit filed by members of the United States Armed Forces for injuries they suffered while serving as soldiers abroad.  In 2002, plaintiffs and United States Army soldiers Layne Morris and Christopher Speer were serving in Afghanistan when al Qaeda members attacked their Army unit.  The attack left Mr. Morris permanently injured and killed Mr. Speer.  One of the attackers was Omar Khadr, son of defendant Ahmad Sa'id Khadr.

Plaintiffs sued Mr. Khadr under the ATA seeking damages for injuries they suffered in the attack.  Mr. Khadr's time to respond to the complaint has lapsed, and he has failed to plead or otherwise respond.  Plaintiffs have now moved for default judgment.

Because Mr. Khadr has not responded to the complaint, the court has "an affirmative duty to look into its jurisdiction both over the subject matter and the parties" before entering judgment.[1]  The court has performed these jurisdictional analyses and holds that it has subject matter jurisdiction in this case and has personal jurisdiction over Mr. Khadr.  The court therefore enters default judgment against Mr. Khadr in the amount of $102.6 million, finding these damages to be reasonable.

I.      **Factual Background**

For purposes of resolving the pending motion for default judgment, the court finds the following facts:  On July 27, 2002, Layne Morris and Christopher Speer — soldiers in the United States Army — were attacked by a band of al Qaeda members in Afghanistan while searching for foreign fighters in a remote Afghani village.  The surprise attack occurred while Army translators were talking to men inside a compound.  Al Qaeda operatives in the compound threw grenades at the soldiers, who were standing outside the compound's walls, and shot them with automatic weapons.  Shrapnel entered Mr. Morris's head and severed the optic nerve in his right eye, leaving him permanently blind.  Fortunately he survived.  On August 6, 2002, however, Mr. Speer died from the injuries he sustained in the attack.

---

[1]*Dennis Garberg & Assocs., Inc. v. Pack-Tech Int'l Corp.*, 115 F.3d 767, 772 (10th Cir. 1997) (quotation marks and emphasis omitted).

Defendant Ahmad Khadr was a Canadian citizen and a long-time member of al Qaeda. He joined the organization many years before the September 11 attacks and became acquainted with its senior leaders, including Osama bin Laden, who eventually installed him in several high-ranking al Qaeda positions.  Besides his leadership, Mr. Khadr contributed to al Qaeda in many ways — he provided substantial financial support and personnel assistance to help the group achieve its international terrorism objectives.  Of particular relevance here, Mr. Khadr encouraged his sons to join al Qaeda and to carry out its work.

Omar Khadr, one of Mr. Khadr's sons, heeded his father's call and joined al Qaeda. Omar participated in the July 27 attack that killed Mr. Speer and wounded Mr. Morris.  The complaint alleges (and plaintiffs have introduced evidence that shows) that Omar himself was directly responsible for Mr. Speer's death and at least indirectly responsible for Mr. Morris's injuries.  Plaintiffs have also produced evidence indicating that Omar was captured during the ambush attack and is now a prisoner at Guantanamo Bay, Cuba.

After learning of this evidence, plaintiffs filed this suit under the Anti-Terrorism Act.[2] Mr. Morris seeks $5.2 million in damages for himself and his family, and Ms. Speer seeks $31.5 million on behalf of Mr. Speer's estate and his family.  By statute, these damages must be trebled; plaintiffs thus seek a combined total of $110.1 million in damages.  They also seek attorney's fees.

Given the obvious difficulties of serving process on Mr. Khadr personally, or of obtaining a waiver of service, plaintiffs moved under Rule 4(f) of the Federal Rules of Civil Procedure for

---

[2]18 U.S.C. § 2333(a).

leave to serve process by publication.  The court granted this motion and allowed plaintiffs to

serve process by publishing one notice in a newspaper of general circulation in the Toronto,

Canada area, and by posting the complaint on the website www.september11classaction.com.[3]

Plaintiffs served process as directed.  After the time for answering expired without any response

from Mr. Khadr, plaintiffs moved for entry of default judgment.

**II.     Discussion**

Before the court can enter a default judgment, it must have subject matter jurisdiction

over the action and personal jurisdiction over the absent defendant.[4]  The court will first discuss

the ATA's framework and then whether, based on that framework, it has subject matter

jurisdiction and personal jurisdiction in this case.

*A.      The Anti-Terrorism Act.*

The Anti-Terrorism Act ("ATA") evinces Congress's intent "to codify general common

law tort principles and to extend civil liability for acts of international terrorism to the full

reaches of traditional tort law."[5]  In 18 U.S.C. § 2333, Congress created a cause of action for

United States nationals who were injured by "terrorism that occurred in a foreign country."[6]

Plaintiffs seek damages under this section, which provides:

_____

[3]Order Granting Mot. for Service by Publication Pursuant to Fed. R. Civ. P. 4(f) (Docket No. 12), *Morris v. Khadr*, Case No. 2:04-CV-00723 PGC (D. Utah filed Apr. 19, 2005).

[4]*Pack-Tech*, 115 F.3d at 772.

[5]*Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1010 (7th Cir. 2002) (citing 137 Cong. Rec. S4511-04 (Apr. 16, 1991)).

[6]*Id.*

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.[7]

The act defines "international terrorism" as "activities that—"

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
> (B) appear to be intended—
>> (i) to intimidate or coerce a civilian population;
>> (ii) to influence the policy of a government by intimidation or coercion; or
>> (iii) to affect the conduct of a government by assassination or kidnapping; and
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum[.][8]

Though this definition of international terrorism gives the ATA an expansive reach, the act has limits. Of particular importance to this case, the statute expressly states that "[n]o action shall be maintained under section 2333 of this title for injury or loss by reason of an *act of war*."[9] An "act of war," in turn, "means any act occurring in the course of—(A) declared war; (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed

---

[7] 18 U.S.C. § 2333(a).

[8] *Id.* § 2331(1).

[9] *Id.* § 2336(a) (emphasis added).

conflict between military forces of any origin."[10]  Keeping in mind this statutory framework, the court now turns to its jurisdictional analyses.

       B.       *This Court Has Subject Matter Jurisdiction.*

       The first question the court must consider is whether it has subject matter jurisdiction over this action.  "Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto."[11]  As such, "every federal . . . court has a special obligation to 'satisfy itself . . . of its own jurisdiction.'"[12]

       Here, plaintiffs invoke 28 U.S.C. § 1331 as the basis for this court's jurisdiction because their cause of action "aris[es] under" the ATA, one of the "laws . . . of the United States."  While satisfying its obligation to determine whether the court has subject matter jurisdiction over this ATA case, the court discovered two potential jurisdictional problems: First, do the plaintiffs have standing to assert their claims?  Second, does the ATA's "act of war" exclusion bar their claims?  As discussed below, the court holds that plaintiffs have standing, and that defendant's alleged acts are not acts of war excluded from the ATA.

       1.       *Plaintiffs Have Standing.*

       The court has considered whether the plaintiffs have standing — that is, whether they have alleged an injury traceable to a specific defendant that will be redressed by action of the

---

[10]*Id.* § 2331(4).

[11]*Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).

[12]*Id.* (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934)).

court.  Because standing is a constitutional component of a federal court's subject matter jurisdiction, federal courts must ascertain in each case whether the parties have standing to present their claims.[13]  "'The essence of the standing question, in its constitutional dimension, is whether the plaintiff has alleged such a personal stake in the outcome of the controversy to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf.'"[14]

A long line of United States Supreme Court cases has "established that the irreducible constitutional minimum of standing contains three elements,"[15] which are:

> (1) "injury in fact," by which we mean an invasion of a legally protected interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) a causal relationship between the injury and the challenged conduct, by which we mean that the injury "fairly can be traced to the challenged action of the defendant," and has not resulted "from the independent action of some third party not before the court"; and (3) a likelihood that the injury will be redressed by a favorable decision, by which we mean that the "prospect of obtaining relief from the injury as a result of a favorable ruling" is not "too speculative."[16]

"The party invoking federal jurisdiction bears the burden of establishing these elements," and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the same manner and degree of evidence required at the successive

---

[13]*See id.* (citing *Juidice v. Vail*, 430 U.S. 327, 331–32 (1977)).

[14]*Holly Sugar Corp. v. Goshen County Co-op Beet Growers Ass'n*, 725 F.2d 564, 567–68 (10th Cir.1984) (quoting *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 260–61 (1977)) (other quotation marks omitted).

[15]*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

[16]*Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 663 (1993) (citations omitted).

stages of the litigation."[17]  As such, "[w]hen deciding the issue of standing" on the pleadings, "a court must accept as true all of the material allegations of the complaint and must view the complaint in the manner most favorable to the complaining party."[18]

The plaintiffs in this case unquestionably have suffered an injury in fact.  So the standing questions that initially gave the court pause are causation and redressability: How can American soldiers serving abroad know the identity of persons who carry out (or who aid and abet those who carry out) a roadside bombing or ambush such that — in a subsequent ATA suit — the soldiers' injuries "fairly can be traced to" the named defendant?[19]  And even if the attacker's identity is learned and the correct defendant named, would a decision from this court redress the injuries plaintiffs suffered?

While the answers to these two questions may create standing problems in future ATA cases involving American soldiers, they pose no barrier to plaintiffs' standing in this case.  Plaintiffs have cited numerous articles and news reports, including interviews of the defendant's immediate family, that indicate Omar Khadr played a central role in the attack on Mr. Morris and Mr. Speer.  Similar evidence also indicates that Omar's father — Mr. Khadr — served in leadership roles within al Qaeda, provided the group with financial and other support, and actively encouraged his son Omar to join al Qaeda's ranks and attack American targets.  Since the Tenth Circuit has said that courts must view the complaint in the manner most favorable to

---

[17]*Lujan*, 504 U.S. at 561.

[18]*Holly Sugar Corp.*, 725 F.2d at 568 (citing *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

[19]*City of Jacksonville*, 508 U.S. at 663 (quotation marks omitted).

the complaining party when determining whether a plaintiff has standing,[20] the court finds that

plaintiffs' complaint establishes a causal connection between Mr. Khadr and the attack on

Messrs. Morris and Speer that satisfies Article III's standing requirement.

It is of no consequence that Mr. Khadr did not himself throw the incendiary device.  As

the United States Court of Appeals for the Seventh Circuit has held, § 2333 liability extends to

both on-the-ground terrorists and those who aid and abet them.[21]  The Seventh Circuit reasoned

that "Congress purposely drafted the statute to extend liability to all points along the causal chain

of terrorism."[22]  This includes aiders and abettors such as Mr. Khadr who provide money to

terrorists.  As the circuit said, "fail[ing] to impose liability on aiders and abettors who knowingly

and intentionally fund[] acts of terrorism . . . would be thwarting Congress' clearly expressed

intent to cut off the flow of money to terrorists at every point along the causal chain of

violence."[23]  And in this case, Mr. Khadr provided more than money — he forged another link in

the causal chain by encouraging his son to perpetrate terror.  These facts readily demonstrate the

requisite Article III causal connection.

Finally, plaintiffs have shown that they have more than a "speculative" prospect of

obtaining redress if the court rules in their favor.[24]  Plaintiffs have introduced evidence that

---

[20]*Holly Sugar Corp.*, 725 F.2d at 568 (citing *Warth*, 422 U.S. at 501).

[21]*Boim*, 291 F.3d at 1020–21.

[22]*Id.* at 1020.

[23]*Id.* at 1021.

[24]*City of Jacksonville*, 508 U.S. at 663.

shows that, after September 11, the United States froze Mr. Khadr's assets in this country.

Armed with a judgment from this court, plaintiffs may be able to tap into those assets.  This

establishes a "likelihood that the injury will be redressed by a favorable decision."[25]

Viewed in the light most favorable to plaintiffs, the complaint's allegations show that

plaintiffs have suffered an injury in fact that was caused by the defendant and likely would be

redressed by a favorable decision from this court.  The Constitution requires no more; plaintiffs

have established standing.

      *2.*    *The "Acts of War" Exclusion.*

The second potential hurdle to this court's subject matter jurisdiction is the ATA's

prohibition of lawsuits for injuries that stem from "acts of war."[26]  The court holds that the acts

complained of are not "acts of war" under § 2336(a) but are acts of international terrorism under

§ 2331(1).  Accordingly, the acts of war exclusion does not apply, and the court has subject

matter jurisdiction.

      a.    Plaintiffs Need Make Only a Prima Facie Showing that the Attack Was Not an "Act of War."

Unlike the standing doctrine just discussed,[27] there is a dearth of authority concerning

how rigorously a court must assess the non-constitutional aspects of its subject matter

jurisdiction before entering a default judgment.  The Tenth Circuit has instructed district courts

to assess their subject matter jurisdiction and personal jurisdiction before granting default

---

[25]*Id.*

[26]18 U.S.C. § 2336(a).

[27]*See Holly Sugar Corp.*, 725 F.2d at 568 (citing *Warth*, 422 U.S. at 501).

judgment.[28]  These cases, however, discuss the required level of proof only for personal

jurisdiction.[29]  For instance, in *Dennis Garberg & Associates, Inc. v. Pack-Tech International*

*Corp.*, the circuit discussed the "two basic determinations [that] are required to decide the

*personal jurisdiction* issue" and said that "[i]t is true that the plaintiff need only make a *prima*

*facie* showing on these two questions if the motion [to dismiss] is decided only on the basis of

the parties' affidavits and other written materials."[30]  If those jurisdictional facts are ever

disputed, the level of proof changes to "a preponderance of the evidence."[31]  But personal

jurisdiction and subject matter jurisdiction are two separate inquiries, and Tenth Circuit

precedent seems to ignore the latter in the default judgment context.  Precedent in other circuits

reflects this same void.[32]

While the Tenth Circuit has not said how deeply a court must delve into a sua sponte

subject matter jurisdiction analysis before entering default judgment, it has outlined what

standards should govern a court's review of a complaint's allegations when responding to a Rule

12(b)(1) motion to dismiss.  Rule 12(b)(1) motions typically present either facial attacks or

---

[28]*See, e.g.*, *Pack-Tech*, 115 F.3d at 772 (citing *Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1203 (10th Cir. 1986)).

[29]*See id.*

[30]*Id.* at 773 (emphasis added).

[31]*Id.*

[32]*See, e.g.*, *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 153–54 (2d Cir. 1999) (vacating default judgment and discussing the need to establish personal jurisdiction by a preponderance of the evidence); *see also Sys. Pipe & Supply, Inc. v. M/V Viktor Kurnatovskiy*, 242 F.3d 322, 324 (5th Cir. 2001) (discussing only personal jurisdiction in default judgment context); *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999) (same).

factual attacks on a court's subject matter jurisdiction.[33]  "Under a facial attack, the movant

merely challenges the sufficiency of the complaint, requiring the district court to *accept the*

*allegations in the complaint as true*."[34]  But in a factual attack, "the movant goes beyond the

allegations in the complaint and challenges the facts upon which subject matter jurisdiction

depends.  In such a situation, the court *must look beyond the complaint* and has wide discretion to

allow documentary and even testimonial evidence under Rule 12(b)(1)."[35]

These two alternatives — accepting the allegations as true versus looking beyond the

complaint — require markedly different district court responses when subject matter jurisdiction

is challenged.[36]  Although these standards have been applied only in cases involving Rule

12(b)(1) motions, they provide useful guidance in the default judgment context — where, by

definition, no motion to dismiss has been filed.  As a result, the court holds that, when inquiring

into its subject matter jurisdiction before entering default judgment, the court should require only

---

[33]*Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Continental Carbon Co.*, 428 F.3d 1285, 1292 (10th Cir. 2005) (citing *Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir. 1995)).

[34]*Id.* (emphasis added).

[35]*Id.* (citation omitted) (emphasis added).

[36]And in other instances, jurisdictional challenges require yet a third type of response: "'when the resolution of the jurisdictional question is intertwined with the merits of the case,'" a court must "'convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion.'"  *Id.* (quoting *Holt*, 46 F.3d at 1003).  Any such conversion dramatically alters the parties' rights if the motion is granted.  A Rule 12(b)(1) dismissal must be without prejudice.  *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006).  But if a Rule 12(b)(1) motion is converted to a Rule 12(b)(6) or Rule 56 motion and granted, that dismissal will be with prejudice because it necessarily involves the complaint's merits.  *See id.* at 1219.

a prima facie showing that subject matter jurisdiction exists.[37]  And when deciding whether plaintiffs have made a prima facie showing of subject matter jurisdiction, the court "must construe all relevant allegations in the light most favorable to the plaintiff."[38]

At least four reasons support this approach.  First, a prima facie showing is all that is required to establish personal jurisdiction in the default judgment setting.[39]  Though personal jurisdiction, unlike subject matter jurisdiction, can be waived,[40] it makes little sense to hold plaintiffs to a higher initial standard as to subject matter jurisdiction than personal jurisdiction, particularly when a defendant has failed to appear and challenge either.

Second, requiring a district court to employ the methodology used to resolve "factual attacks" on subject matter jurisdiction — making a court sua sponte "look beyond the complaint" and "challenge[] the facts upon which subject matter jurisdiction depends"[41] — effectively turns the court into the plaintiff's adversary.  Requiring more than a prima facie showing might lead to a court making jurisdictional arguments for an absent defendant that are "intertwined with the merits of the case"[42] and possibly to a dismissal with prejudice, even though a defendant failed to

---

[37]*Cf. Pack-Tech*, 115 F.3d at 773 (discussing personal jurisdiction).

[38]*Laguna Gatuna, Inc. v. Browner*, 58 F.3d 564, 565 (10th Cir. 1995).

[39]*See Pack-Tech*, 115 F.3d at 773.

[40]*See Williams*, 802 F.2d at 1202–03.

[41]*Continental Carbon Co.*, 428 F.3d at 1292.

[42]*Id.* (citing *Holt*, 46 F.3d at 1003).

respond to the complaint.  Federal courts must ensure that they have subject matter jurisdiction, but a prima facie showing meets this requirement without pitting the court against the plaintiff.

Third, the Tenth Circuit has held that since federal courts are courts of limited jurisdiction, the burden is on the plaintiff "to show, by a preponderance of the evidence, that jurisdiction exists."[43]  But under Tenth Circuit precedent, the preponderance of the evidence standard only applies "[i]f jurisdiction is challenged."[44]  This rule implies that the preponderance of the evidence standard does *not* apply if jurisdiction is unchallenged, such as in the default judgment context.  This rule also implies that the applicable level of proof when jurisdiction is unchallenged is less than a preponderance of the evidence — in other words, a prima facie showing of subject matter jurisdiction is sufficient to enter a default judgment.

Finally, a default judgment entered without subject matter jurisdiction is void and therefore subject to collateral attack under Rule 60(b).  Courts will duly consider a motion to vacate a default judgment based on lack of subject matter jurisdiction to ensure that the court entering judgment acted within Article III's limits.  For all these reasons, courts evaluating their own subject matter jurisdiction before entering a default judgment should require only a prima facie showing that the statute grants them subject matter jurisdiction, should assume that the allegations in a plaintiff's complaint are true, and should draw all inferences in the plaintiff's favor.

---

[43]*United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 788 (10th Cir. 2002).

[44]*Celli v. Shoell*, 40 F.3d 324, 327 (10th Cir. 1994).

      b.      Plaintiffs Have Made a Prima Facie Showing that the Attack Was Not an "Act of War."

Having determined the appropriate lens through which to view plaintiffs' complaint, the court finds that plaintiffs complain of acts of international terrorism and not acts of war. Plaintiffs specifically allege that the Khadrs' acts are not "acts of war."[45]  More important, the factual allegations in plaintiffs' complaint do not, when viewed in the light most favorable to plaintiffs, describe acts that fall within the ATA's definition of acts of war.

Of the ATA's definitions of "acts of war," the two that are conceivably relevant are (B) — "armed conflict, whether or not war has been declared, between two or more nations" — and (C), "armed conflict between military forces of any origin."  Subsection (B), involving conflict between "nations," does not apply because plaintiffs allege that "Al Qaeda is not a foreign state or an agency of a foreign state."[46]

Subsection (C) is a somewhat closer call since it covers "armed conflict between military forces of any origin."  Plaintiffs allege that al Qaeda is a "terrorist organization" that was "created for the purpose of committing international terrorism."[47]  But they also allege that "the Al Qaeda organization was headquartered in Afghanistan and involved a cluster of *military*-ideological camps dedicated to their goal of establishing a universal Islamic State through the use of violence."[48]  This allegation could be interpreted as stating that the trainees at al Qaeda's

---

[45]*See* Compl. ¶ 12.

[46]*Id.* ¶ 11.

[47]*Id.* ¶ 10.

[48]*Id.* (emphasis added).

"military-idological camps," upon completion of their training, constitute a "military force."[49]  If so, the attack on Mr. Morris and Mr. Speer might well be an "act of war" excluded from the ATA's purview.

        This allegation, however, is equally susceptible of other plausible readings.  For instance, even if al Qaeda established "military" camps, it does not automatically follow that graduates of those camps are operating as a "military force" when they use skills learned there.  A person might receive what can legitimately be called "military" training but employ it in a terroristic fashion to achieve terroristic ends.  For example, Timothy McVeigh, a former member of the United States Army, reportedly used skills learned in the military to commit a deadly act of terrorism in Oklahoma City.[50]

        And beyond the competing interpretations of this single allegation, the court finds that the complaint's allegations, viewed in their entirety and in the light most favorable to plaintiffs, make a prima facie showing that al Qaeda is not a "military force of any origin."  There are undoubtedly differences between military forces and terrorists.  A conventional dictionary definition of "military" is "armed forces" or the persons serving in them.[51]  "Armed forces," in turn, are "the combined military, naval, and air forces *of a nation*."[52]  In contrast, "terrorism" is

_____

        [49]18 U.S.C. § 2331(4)(C).

        [50]*See generally United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998) (decision upholding McVeigh's conviction).

        [51]Merriam-Webster's Collegiate Dictionary 788 (11th ed. 2003).

        [52]*Id.* at 67 (emphasis added).

conventionally defined as "the systematic use of terror especially as a means of coercion."[53] "Terror" itself is defined as "violent or destructive acts (as bombing) committed by *groups* in order to intimidate a population or government into granting their demands."[54]

As between these two possibilities, al Qaeda fits only in the latter, where plaintiffs have alleged they belong.  Al Qaeda is not a "nation"; the people who fight in its behalf thus cannot be "armed forces" or the "military."  It is, instead, a "group" that systematically uses violent and destructive acts in its attempts to coerce the United States into acceding to its demands.

Plaintiffs' complaint alleges acts of terrorism, not acts of a nation's armed forces. The court refuses to be al Qaeda's advocate and force plaintiffs to prove that, in fact, al Qaeda's members are not "military forces of any origin" that would be entitled to immunity under the ATA.  Aside from the difficulty of proving a negative, the burden should fall on Mr. Khadr to prove that his associates were a military force if he wishes to invoke this ATA exclusion.

In sum, plaintiffs allege that the event that killed Mr. Speer and wounded Mr. Morris was a terrorist attack and not an act of war.  These allegations are prima facie evidence that § 2336(a)'s "acts of war" exclusion does not apply here.  The court therefore has subject matter jurisdiction.

C.    *This Court Has Personal Jurisdiction over Mr. Khadr.*

Unlike the subject matter jurisdiction issue, the personal jurisdiction issue in this case is not novel; several courts have faced similar facts.  These courts have held that the Due Process

---

[53]*Id.* at 1290.

[54]*Id.* (emphasis added).

Clause's "minimum contacts" requirement for personal jurisdiction is met when terrorists

"'engage[] in unabashedly malignant actions directed at [and] felt in'" the forum.[55]  The court

agrees with this analysis and holds that it has personal jurisdiction over Mr. Khadr.

Rule 4(k)(2) of the Federal Rules of Civil Procedure establishes this court's jurisdiction.

This section provides:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the
> United States, serving a summons . . . is also effective, with respect to claims
> arising under federal law, to establish personal jurisdiction over the person of any
> defendant who is not subject to the jurisdiction of the courts of general
> jurisdiction of any state.[56]

As the United States Court of Appeals for the District of Columbia Circuit explained,

> Rule 4(k)(2) thus permits a federal court to exercise personal jurisdiction over a
> defendant (1) for a claim arising under federal law, (2) where a summons has been
> served, (3) if the defendant is not subject to the jurisdiction of any single state
> court, (4) provided that the exercise of federal jurisdiction is consistent with the
> Constitution (and laws) of the United States.[57]

Here, plaintiffs' complaint arises under the ATA.  The court previously authorized

service by publication under Rule 4(f) of the Federal Rules of Civil Procedure.  The plaintiffs

properly completed this service.  Rule 4(k)(2)'s first and second elements are thus satisfied.

Plaintiffs also satisfy the third element because Mr. Khadr is not subject to the

jurisdiction of any single state court.  The court adopts the burden-shifting framework that the

---

[55]*Mwani v. Bin Laden*, 417 F.3d 1, 13 (D.C. Cir. 2005) (quoting *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C. Cir. 2000)).

[56]Fed. R. Civ. P. 4(k)(2).

[57]*Mwani*, 417 F.3d at 10.

Fifth, Seventh, and District of Columbia Circuits have endorsed for analyzing this element.  As these circuits have held, the defendant must show a state where he can be sued:

> "A defendant who wants to preclude the use of Rule 4(k)(2) has only to name some other state in which the suit could proceed.  Naming a more appropriate state would amount to a consent to personal jurisdiction there (personal jurisdiction, unlike federal subject-matter jurisdiction, is waivable).  If, however, the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)."[58]

This approach permits the court and plaintiffs to "avoid the daunting task" of "'traips[ing] through the 50 states, asking whether each could entertain the suit.'"[59]  Here, Mr. Khadr has not pointed to another more appropriate state forum.  This element is therefore met.

The final inquiry under Rule 4(k)(2) is whether exercising personal jurisdiction over Mr. Khadr "is consistent with the Constitution and laws of the United States" — that is, does Mr. Khadr have "sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction under the Due Process Clause of the Fifth Amendment"?[60]  The Clause "requir[es] that individuals have 'fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign'"[61] and "'gives a degree of predictability to the legal system

---

[58]*Id.* at 11 (quoting *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001)); *see also Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004) (adopting this burden-shifting framework).

[59]*Id.* (quoting *ISI Int'l*, 256 F.3d at 552).

[60]*Id.*; *see also ISI Int'l*, 256 F.3d at 551.

[61]*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring in judgment)) (second alteration in original).

that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'"[62]

As previously noted, "the constitutional touchstone" of the due process inquiry is "whether the defendant purposefully established 'minimum contacts' in the forum."[63]  In terrorism cases, courts have employed the "effects doctrine" to establish the requisite minimum contacts for personal jurisdiction.[64]  Under this doctrine, "'jurisdiction may attach if the defendant's conduct is aimed at or has an effect in the forum.'"[65]  Terrorism cases provide textbook examples of "'unabashedly malignant actions'" aimed at the United States whose effects are "'directed at [and] felt'"[66] here.  It is more than foreseeable that a terrorist attack against U.S. interests will cause "injury in the" United States;[67] terrorism *by definition* causes injury.  Because injury in the United States undeniably is a foreseeable effect of a terrorist attack purposefully directed at this country's citizens, terrorism inherently is the sort of "conduct and connection with" the United States that should cause a foreign terrorist to "reasonably anticipate being haled into court" here.[68]

---

[62]*Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

[63]*Id.* at 474 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

[64]*See Mwani*, 417 U.S. at 4.

[65]*GTE*, 199 F.3d at 1349 (quoting *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998)).

[66]*Mwani*, 417 F.3d at 13 (quoting *GTE*, 199 F.3d at 1349).

[67]*See id.* at 12 (citing *World-Wide Volkswagen Corp.*, 444 U.S. at 295)

[68]*World-Wide Volkswagen Corp.*, 444 U.S. at 295.

The effects doctrine, moreover, creates personal jurisdiction even when a defendant did not personally participate in the attack itself.[69]  To establish jurisdiction over a terrorist, "'Plaintiffs must make a prima facie showing of each Defendant's personal or direct participation in the *conduct giving rise* to Plaintiffs' injuries.'"[70]  Terrorist attacks require more than a triggerman — they also require financing, planning, and coordinating before a bomb detonates or a planes flies into a building.  As such, a defendant's "conduct giving rise" to a terrorism victim's injuries includes any personal "participation in al Qaeda's terrorist agenda," not just an attack.[71]

Based on the effects doctrine, plaintiffs have shown that Mr. Khadr had the requisite minimum contacts with the United States as a whole to warrant this court's exercise of personal jurisdiction over him.  Al Qaeda's attack on Mr. Morris and Mr. Speer was an "unabashedly malignant action[] directed at [and] felt in" the United States.  It killed one American soldier and left another permanently blinded in one eye.  Two families in this country no doubt continue to feel these horrific effects every day.  And plaintiffs have made a prima facie showing that Mr. Khadr actively participated in and helped plan al Qaeda's terrorist agenda — so much so, in fact, that he convinced his son to risk his life and attack American soldiers.  Since the attack complained of here occurred several years after the September 11 attacks and the lawsuits stemming from them,[72] Mr. Khadr should have foreseen that attacking Americans was the sort of

---

[69]*In re Terrorist Attacks on Sept. 11, 2001*, 392 F. Supp. 2d 539, 558 (S.D.N.Y 2005)

[70]*Id.* (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 809 (S.D.N.Y. 2005)).

[71]*Id.*

[72]*See id.* (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d at 765).

"conduct and connection with the" United States that might reasonably lead him to be "haled into court" here.[73]

### III.   Damages

Because the court has subject matter and personal jurisdiction, it may properly enter default judgment against Mr. Khadr as plaintiffs request.  The only remaining issue is the amount of damages the court should award.  Each family has requested different damage awards.  The court will discuss each family's request separately.

#### A.   *The Speer Family*

The Speer family asks this court to award damages of $31.5 million in connection with Christopher Speer's death.  This amount represents lost wages of approximately $1.5 million; $10 million for Mr. Speer's pain and suffering before he died; and $20 million to Mr. Speer's wife and children (his "heirs"[74]) for their loss of companionship, society, guidance, and mental anguish.  Ms. Speer has provided affidavit testimony as evidence in support of these damage amounts.

Damages are available under § 2333(a) for each type of harm the Speer family suffered and for which they seek redress.[75]  The court may appropriately consider affidavit testimony as

---

[73]*Mwani*, 417 F.3d at 12 (quoting *Burger King*, 471 U.S. at 474).

[74]18 U.S.C. § 2333(a).

[75]*Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 589 (E.D.N.Y. 2005); *Estates of Ungar & Ungar ex rel. Strachman v. Palestinian Auth.*, 325 F. Supp. 2d 15, 66 (D. R.I. 2004).

evidence in support of plaintiffs' claimed damages.[76]  The court has reviewed Ms. Speer's

affidavit and other ATA cases she cited to establish the reasonableness of her family's emotional

distress damages stemming from Mr. Speer's killing. [77]  After reviewing this evidence, the court

finds the requested damages to be reasonable and holds that the Speer family is entitled to the full

amount of damages they seek.  The court therefore enters judgment against Mr. Khadr in the

amount of $31.5 million.  This amount must be trebled under 18 U.S.C. § 2333(a); the Speers are

therefore entitled to a judgment of $94.5 million.

B.     *Layne Morris*

Mr. Morris seeks smaller damages than Mr. Speer's estate, largely because he (unlike Mr.

Speer) survived Omar Khadr's attack.  Mr. Morris seeks $200,000 in lost income; $2.5 million

for pain and suffering; and $2.5 million on behalf of his family for their pain and suffering.  Like

Ms. Speer, Mr. Morris submitted affidavit testimony as evidence supporting the amount of

damages he seeks.

The court agrees that Mr. Morris should be awarded damages for his lost income and pain

and suffering.  The ATA's plain language, however, precludes the court from awarding any

damages to his family based on his complaint as pled.  To avoid any confusion, the court in no

way means to minimize the harms suffered by Mr. Morris's family.  But as discussed above, the

court's power is limited by congressional grants of authority.  The court's authority here comes

---

[76]*Cf. Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 224
(S.D.N.Y. 2003) (permitting affidavit testimony to establish damages in a Foreign Sovereign
Immunities Act case).

[77]*See Ungar*, 325 F. Supp. 2d at 67; *Smith*, 262 F. Supp. 2d at 232–38.

from the ATA, which provides a right of action to "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs."[78]  All the allegations in this complaint point to Mr. Morris as the injured "national of the United States."  Because Mr. Morris survived the attack, he — unlike Mr. Speer — has no "survivors" or "heirs" that can recover for his injuries on his behalf.  An "heir" is a "person who, under the laws of intestacy, is entitled to receive an intestate *decedent's* property."[79]  A "survivor" is "[on]e who outlives another."[80]  At this time, the court cannot say whether Mr. Morris's wife or children are his heirs or survivors because he has not passed away. Because Congress chose to write the statute in the disjunctive, the court is permitted to award damages only to injured U.S. nationals *or* their survivors or heirs — not to family members of an injured but surviving U.S. national solely for *the U.S. national's* injuries.

This is not to say, however, that the ATA completely blocks the Morris family from recovering for their pain and suffering.  In fact, courts have interpreted the ATA as permitting suits brought by family members of those injured by international terrorism.  For instance, in *Biton v. Palestinian Interim Self-Government Authority*, the United States District Court for the District of Columbia held that a woman whose husband (a non-U.S. citizen) died in a Gaza Strip bus bombing could maintain an ATA suit even though she was not personally on the bombed bus

---

[78]18 U.S.C. § 2333(a) (emphasis added).

[79]Black's Law Dictionary 727 (7th ed. 1999) (emphasis added); *see also* Utah Code Ann. § 75-1-201(17) ("'Heirs' means those persons, including the surviving spouse, who are entitled under the statutes of intestate succession to the property of a *decedent*." (emphasis added)).

[80]Black's Law Dictionary 1459.

or injured in the blast.[81]  She could not recover as her husband's "heir" under the statute because

her husband was not a U.S. national.[82]  But she was a U.S. citizen, and the loss of her husband —

with the attendant loss of marital services, companionship, and affection — qualified as a

redressable injury in her "person" under the ATA.[83]  And in *Linde v. Arab Bank, PLC*, the court

held that "U.S. citizens suing for various non-physical injuries, such as emotional distress and

loss of consortium, after their family members, who were not U.S. nationals, became victims of

acts of international terrorism" could state a claim under the ATA.[84]  The court refused to "limit

the scope of Section 2333(a) to physical injuries to U.S. nationals."[85]

 The court agrees with the analysis in these cases.  As previously discussed, Congress

intended for the ATA to have a broad scope.[86]  Its purpose is "to grant a remedy to U.S. nationals

and their families who suffered from an injury to an individual or property as a result of

international terrorism."[87]  To achieve this purpose, courts have interpreted the ATA as

permitting claims by U.S. nationals for nonphysical injuries they suffered as a result of a terrorist

---

[81]310 F. Supp. 2d 172, 181–82 (D.D.C. 2004).

[82]*See* 18 U.S.C. § 2333(a) (creating a cause of action only for injured U.S. nationals or their heirs).

[83]*Biton*, 310 F. Supp. 2d at 181–82.

[84]384 F. Supp. 2d 571, 589 (E.D.N.Y. 2005).

[85]*Id.*

[86]*See supra* notes 21–23 and accompanying text.

[87]*Linde*, 384 F. Supp. 2d at 589.

attack on their noncitizen family members.[88]  The court extends this rationale and holds that the ATA permits claims by U.S. citizens for their nonphysical injuries that result from a terrorist attack on their family member if the attack victim is a U.S. citizen who survives the attack.

Based on this holding, the Morris family could state a claim under the ATA for *their* nonphysical injuries that stem from the attack on Mr. Morris.  The problem here, however, is that the complaint does not name any member of the Morris family except plaintiff Layne Morris as an injured individual seeking redress under the ATA.  Undoubtedly, members of the Morris family have suffered individual injuries — loss of consortium, marital services, companionship, and affection.  But since Mr. Morris survived the attack, his family members cannot recover for those injuries derivatively through him; they must do so as individual plaintiffs who allege personal injury in a complaint.

If Ms. Morris and her children were named plaintiffs; if the complaint contained any allegations that described how the attack affected them individually; or if the causes of action sought redress for their individual injuries, this case would fall neatly within *Biton*'s and *Linde*'s rationale as extended here.  The complaint as it currently stands does none of those things.  As a result, the court may award damages only to Mr. Morris as the injured U.S. national, and — since he is still alive — not to the Morris family as "heirs" or "survivors."

Therefore, the court enters default judgment in favor of Mr. Morris against Mr. Khadr in the amount of $2.7 million.  This amount must be trebled; the total award thus is $8.1 million.

---

[88]*See id.*; *see also Biton*, 310 F. Supp. 2d at 181–82.

**IV.    Conclusion**

Plaintiffs have made a prima facie showing that they have standing and that Mr. Khadr's acts were not acts of war.  The court therefore has subject matter jurisdiction over this case.  The court also has personal jurisdiction over Mr. Khadr because he purposefully directed his malignant actions at U.S. citizens and intended the effects of his acts to be felt in this country.  Because the court has subject matter jurisdiction and personal jurisdiction, it hereby GRANTS plaintiffs' motion for entry of default and enters judgment against Mr. Khadr in the amount of $102.6 million.  This award represents $94.5 million for the Speer family and $8.1 million for Mr. Morris.  By statute, plaintiffs are also entitled to attorney's fees.  Their attorneys shall submit an affidavit of fees to the court within twenty days of the date of this order.

SO ORDERED.

DATED this 16th day of February, 2006.

BY THE COURT:

_____

Paul G. Cassell
United States District Judge